UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**BRANDON MONTGOMERY,**                     CASE NO.: 8:24-cv-01062

    **Plaintiff,**

v.

**SEMINOLE HARD ROCK DIGITAL, LLC**

    **Defendant.**
_____/

## COMPLAINT

Plaintiff, Brandon Montgomery ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class"), brings this class action against Defendant, Seminole Hard Rock Digital, LLC ("Seminole" or "Defendant"). Plaintiff makes the following allegations based upon personal knowledge of his own acts, and upon information and belief and the investigation of counsel upon all other matters.

### Nature of the Action

1.    In 2018, the Supreme Court held that states could legalize sports betting. Accordingly, sportsbooks, such as Seminole to access millions of new bettors, customers, and/or users.

2.    Casinos, sportsbooks, and the like were and are highly motivated to capture new customers, as this is a nascent marketplace in Florida. To ensnare new

users, Defendant invested heavily into advertising and promotional incentives such as sign-up bonuses, "free" bets, and account matching bonuses.

3. Defendant offered several promotions to attract potential users, build a market share, a following, and to maximize its earning potential. Defendant knows that new users could potentially be converted to long-term users, which are extremely profitable for Defendant. Defendant offers several promotions to new users, who may have felt trepidation about risking their hard-earned money on random sports outcomes. Rather than putting its own money on the line for each new customer's first bet, as it implied to its users, Defendant chose to use misleading promotions to lure new users into opening accounts while the users believed the promotional offers they partook in were financially more advantageous to the user than they actually were.

4. One such deceptive practice was Defendant's promotion that told new users that if they signed up, their first bet would come with no risk or regret ("No Regret First Bet"). The bets, however, were not as advertised. The promotion required users place their initial bet with their own money. If a user lost their bet, they were not returned to their original position. Instead, their accounts would be credited with a "Bonus Bet" that is worth less than its counterpart in U.S. dollars, in contrast of what was implied by Defendant's promotional materials.

5. Bonus Bets cannot be withdrawn and must be wagered to be converted to currency. Further, wagers made with the Bonus Bets are not paid out like wagers made with U.S. dollars. A typical bet made with $100 at even odds recovers the initial $100 plus the $100 winnings minus the Defendant's agreed upon cut of 9% ("vig" or "juice"), which results in a payment of approximately $191. By contrast, a winning Bonus Bet of $100 at even odds recovers $100 minus the vig or juice, resulting in a payment of only $91.

6. The Bonus Bet is worth less than half the amount as the initial bet. The difference between the bets, despite the name of the promotional offer, certainly results in much regret to the user due to the fact that it is dishonest and not what Defendant represented.

7. Defendant has paid for large-scale marketing in television and print, in-arena marketing, and extensive social media and internet advertising to promote the false "no regret" Bonus Bet. These advertisements contain materially deceptive representations that allowed Defendant to sign up thousands or millions of new customers. These representations and omissions, which Plaintiff and other reasonable users relied upon, were materially misleading and false.

8. These marketing representations and omissions violate Florida consumer protection law. Reasonable users/consumers, including Plaintiff, were misled to their detriment. They did not receive the advertised benefit of the No

3

Regret First Bet, and in many cases, placed larger or riskier bets than they ordinarily would have but for the misleading advertising.

9. Plaintiff seeks actual damage, punitive damages, statutory damages, attorney fees and costs, to compensate himself and the Class for the injury inflicted upon them by Defendant and to prevent Defendant from further misleading consumers and users of Defendant's gambling app.

## Parties

10. Plaintiff, Brandon Montgomery, is a resident of Bradenton, Florida. Plaintiff made an initial "no regret first bet" in 2024 on Defendant's Hard Rock Bet app, which he lost, resulting in a Bonus Bet that was worth substantially less than its advertised cash equivalent.

11. Defendant, Seminole Hard Rock Digital, LLC owns the Hard Rock Bet app in question, and is a Delaware corporation. It is registered in Florida with a principal address of 5701 Stirling Road, Davie, Florida, which is the Hard Rock Casino Corporate Office.

## Jurisdiction and Venue

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and this is a class action in at least which one member of the class is a citizen of a different state than Defendant. The number

of members of the proposed class in aggregate exceeds 100 users in accordance with 28 U.S.C. § 1332(d)(5)(B). Further, this Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1332(a).

13. This Court has personal jurisdiction over Defendant because it regularly conducts and/or solicits business in, engages in other persistent courses of conduct or action in, and/or derives substantial revenue from products and/or services provided to persons in this District.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant does business in this district and because a substantial part of the events giving rise to these claims occurred in this District.

## Factual Allegations

15. In 2018, the Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that states could regulate sports betting within their borders. As of January 1, 2024, more than 37 states have legalized sports betting. Defendant had a "soft launch" of its app on November 7, 2023.

16. In 2018, total sports betting revenue was $430,000,000. In 2023, sports betting revenue jumped to $10,920,000,000.

17. The rapid expansion of the sports betting industry due in large part to *Murphy,* caused Florida to finally legalize sports gambling. Defendant owns the sole legal platform in the state of Florida which a user can legally bet, and has advertised

across all forms of media with great aplomb in order to capture new users and revenue streams.

18. The innovation of the betting app, which Defendant adopted upon its soft launch in November of 2023, make it possible for users to place bets anywhere within the state (or outside the state with use of a virtual private network) at any hour when sports are live to gamble on.

19. Defendant's app offers the option to bet on international sports as well, meaning a user can place a bet on something at any hour of any day.

20. Defendant knew adding new users was critical to its long-term success even at the opportunity cost of short-term profitability. Defendant had many years to study the strategies of DraftKings, ESPN Bet, Bovada, Betfred, and a myriad of other apps to learn that more initial users inevitably equals more profitability. This analysis was published in many a 10K report associated with the owners of the above apps.

21. Defendant understood and continues to understand that new users is crucial to its continued success.

22. The initial acquisition of a user may cost Defendant upfront, but being the first sportsbook a user signs up is likely to pay for itself may times over.

23. The longer users remain with Defendant, the more time they spend on Defendant's app, and the more money they are likely to spend on sports gambling. On average, new users become profitable for sportsbooks after three months.[1]

24. As Defendant's soft opening in November of 2023, it became available statewide on or about December 5, 2023, just before the NFL playoffs and NCAA bowl games, which are normally the most profitable times of the year for sportsbooks. As legalized sports betting is still in an embryonic state in Florida, Defendant is clearly in its customer acquisition stage, as evidenced by the bombardment of advertising directed at Florida residents through print, social media, internet, and arena advertising. DraftKings has been in its customer acquisition stage since 2018 in states that were the first to adopt legalized sports betting after *Murphy*. As of May 16, 2023, there are thoughts that some markets, such as New Jersey and Pennsylvania, have matured to the state of customer retention after approximately five years.[2]

25. Sportsbooks, including Defendant, usually prefer new users and casual gamblers, who are likely to lose money, as opposed to "sharps," who bet professionally. Sportsbooks and casinos have been known to ban these sharps outright in order to keep their profit margin.

---

[1] https://sportshandle.com/new-york-sportsbooks-customer-acquisition-costs/
[2] https://gamingamerica.com/magazine/7296/online-sportsbook-a-shift-in-player-retention

26. In 2021, calls to the National Problem Gambling Helpline increased by 43%, texts increased by 59.8% and chat volume increased by 84.1%. As states expand legalized sports betting, we expect these numbers to continue to grow.[3]

27. Similarly, states that have legalized sports betting have seen dramatic increases in calls to gambling addiction helplines. In Connecticut, for example, helpline calls jumped 91% in the first year after legalization; in Massachusetts, calls are up 276% since 2020; in Ohio, which just opened the door to legal sports betting in January 2023, calls to the state's problem gambling hotline tripled in the first month compared to the same period last year; in the first year after Virginia legalized sports gambling, calls climbed 387%; in Illinois, calls rose 425% between 2020 and 2022.

28. These trends are particularly prevalent in young men in their 20s, a key demographic for Defendant and other sportsbooks.

29. According to Keith Whyte, executive director of the National Council on Problem Gambling, "We believe that the risks for gambling addiction overall have grown 30% from 2018 to 2021, with the risk concentrated among young males 18 to 24 who are sports bettors."[4]

---

[3] https://www.ncpgambling.org/problem-gambling/helpline-modernization/
[4] https://www.newsweek.com/2023/04/07/sports-betting-boom-linked-rising-gambling-addiction-anxiety-suicide-1789055.html

8

## "No Regret First Bet" Promotion

30. As stated above, Defendant has tantalized users to make their first bets up to $100, with the promise of giving the money back if it doesn't win. The below image was captured from Defendant's website (hardrock.bet) on May 2, 2024.



31. This promotion is clearly aimed to lure new users onto Defendant's app or entice new users to make riskier bets, such as parlays[5] or bets with higher odds and larger payouts, on their first attempt on the app.

32. The "here's how it works" section, which was clicked upon and

---

[5] A parlay is an overall bet on multiple outcomes. If the user wins each of the multiple outcomes, they receive a much higher payout than if they just bet and won on one outcome. If a user bets on 3-4 outcomes and wins them all, it is not uncommon for the user to make a profit in excess of 1000%. This entices users to make parlay bets, but the chance of winning is obviously very low.

expanded for the purpose of this pleading asks users to: 1) download the Hard Rock Bet app, "sign up for your free Hard Rock Bet account today." ; 2) place your first sports bet, "Easy deposits. Paypal, cards, Venmo & more."; and 3) Win or get up to $100 back; "you get the amount you bet back as a Bonus Bet."  Defendant fails to inform its users that the Bonus Bet is worth less than half of the original bet they placed, and instead places a button below the third step asking users to sign up now.

33. Defendant's marketing is clearly designed to overcome any trepidation of risk or any aversion a prospective new user may have towards making a bet. If the bet is "free," users are more likely to engage in riskier bets with higher payouts, such as the aforementioned parlay, because the marketing leads them to believe they will get the initial bet back to make a less risky, or "sharper" bet in the future.

34. Compared to the rest of the U.S., Florida was relatively slow to adopt sports gambling, which in turn likely made its residents more vulnerable to this type of marketing and endangering their financial well-being.

35. Defendant deliberately did not communicate that users availing themselves of the Bonus Bet promotion would only be credited with a Bonus Bet. A commonsense understanding of the "$100 back if your first bet doesn't win" shown in the picture above and other promotional materials made no suggestion that the Bonus Bet would be turned into what a Bonus Bet actually is. The Bonus Bet is, in

fact, far less valuable than $100. Defendant deliberately sowed this confusion by using the dollar symbol ($) in its promotional materials.

36. Here's how Bonus Bets actually work and harm the user. Bonus Bets cannot be withdrawn and must be wagered to be converted to currency. Further, wagers made with the Bonus Bets are not paid out like wagers made with U.S. dollars. A typical bet made with $100 at even odds recovers the initial $100 plus the $100 winnings minus the Defendant's agreed upon cut of 9% ("vig" or "juice"), which results in a payment of approximately $191. By contrast, a winning Bonus Bet of $100 at even odds recovers $100 minus the vig or juice, resulting in a payment of only $91.

37. Defendant actively encourages new users to take riskier bets as described above in detail. Once the new user loses their initial bet, they are not in the same position as they were before placing their bet, in direct contrast to the advertising materials of Defendant. New user losers are left with nothing but regret and half of the value they put into the app.

*[this potion of the page left blank intentionally]*

**Regulators Recognize the Misleading Promotional Language**

38. Regulators have caught on to the misleading language concerning Bonus Bets and their ilk.

39. Matthew Schuler, executive director of Ohio's Casino Control Commission, recently said: "If something is claiming to be free or risk-free, then it has to absolutely not require the patron to incur any loss or risk their own money." Disclosing the risks within the terms and conditions isn't good enough, he added. "We are not supportive of trying to put the truth in small print."[6]

40. New York Attorney General Letitia James went on to clarify: "I urge all New Yorkers watching the Super Bowl and betting online for the first time to be careful – don't let scammers game your gamble. Before placing a bet, do your research into the platform, read the fine print of the offer, and follow our other tips to avoid any red flags and keep the odds in your favor. Online sports betting companies that fumble their advertising to mislead New Yorkers can expect to hear from my office."[7]

41. Even some sportsbooks have realized the innate problems with deceptive advertising calling sports bets "risk free" or "no regret."

---

[6] https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/
[7] https://ag.ny.gov/press-release/2022/consumer-alert-attorney-general-james-warns-new-yorkers-deceptive-online-ports#:~:text=%E2%80%9CI%20urge%20all%20New%20Yorkers%20watching%20the%20Super

a. Penn Entertainment currently has a license from ESPN to run ESPN Bet, which is one of the largest sportsbooks in America.

b. Before Penn Entertainment ran ESPN Bet, it bought a majority share of barstoolsports.com ("Barstool"). Barstool currently averages 54 million unique visitors per month. While Penn Entertainment owned a majority share of Barstool, Barstool's bloggers and podcasters would routinely advertise special gambling rates or bets via the Penn app.

c. One such personality, Barstool BigCat, would promote "can't lose parlays." As discussed above, parlays are extremely risky bets which pay a large dividend if successful, but have a low rate of success. Penn stopped Barstool from advertising these "can't lose parlays," despite understanding the claims were made tongue-in-cheek, expressly to avoid any fraudulent marketing that is currently being foisted upon Florida residents and prospective users by Defendant.

d. Shortly after, Penn Entertainment sold back its majority ownership in Barstool to its founder for $1. Penn Entertainment made the simple decision that its sportsbook empire was worth much more than a website with over 54 million monthly unique visitors. Soon after, Penn Entertainment and ESPN jointly launched the ESPN Bet app.

e. On or about March 24, 2024, ESPN personality Rece Davis was discussing NCAA Men's Basketball Tournament bets with analyst Erin Dolan, in a segment sponsored by ESPN Bet. Mr. Davis and Ms. Dolan are employed by ESPN. Penn Entertainment owns ESPN Bet and are not regulators or watchdogs. Ms. Dolan had done well with her picks up to that point in the tournament and Mr. Davis said on air, in front of millions of viewers, "You know what? Some would call this wagering, gambling; the way you've sold this, I think what it is, is a risk-free investment."[8]

f. Mr. Davis later walked back his comments, saying that a risk-free investment does not exist.[9]

g. According to the Washington Post in a December 2022 article, Betfred COO Bryan Bennett said, "we had some unclear terms, which doesn't do anyone any good… we made a conscious decision not to do that anymore and try to be as upfront as possible."[10]

42. At no time during Defendant's marketing campaign or during the sign-up process, were Plaintiff and the Class Members warned of the true financial risks

---

[8] Video available online at: https://twitter.com/awfulannouncing/status/1771942350568178140
[9] https://twitter.com/ReceDavis/status/1771975905235333595
[10] https://www.washingtonpost.com/sports/2022/12/26/risk-free-bets-mgm-draft-kings-fanduel-caesars/

of using Defendant's services to place a bet, including, but not limited to the immediate risk of losing the entire amount in that initial bet and the risk that losses would not be reimbursed by the Defendant.

43. The Bonus Bet marketing and sign-up process misrepresents and omits several key facts about the service. First, there is a risk and regret, because a user cannot simply cash out a refund if they lose the bet, but instead must place another bet. Second, the Bonus Bet is not worth its case equivalent even if the case was gambled because the user does not receive their stake back if they win, unlike with a normal cash bet.

44. As a result, users like Plaintiff, who signed up for and used the Defendant's Bonus Bet promotion and lost their first bet, ended up losing a substantial portion of their initial stake.

## Class Allegations

45. Plaintiff brings this action on behalf of himself, and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows: Any Florida customer or user who wagered in the state of Florida and utilized a Bonus Bet promotion with Defendant and lost their first bet.

46. Excluded from the Class are Defendant, and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any

judicial officers presiding over this matter and the members of their immediate families and judicial staff.

47. This case is properly brought as a class action under Rule 23(a) and (b)(3) for the following reasons:

    a. Numerosity: The Class is so numerous that joinder of all members in this action is impracticable. The exact number and identity of all Class Members is unknown by Plaintiff at this time. However, Plaintiff believes there are tens of thousands and potentially even hundreds of thousands of Class Members. The number and identity of Class Members can be determined through discovery propounded upon Defendant.

    b. Commonality and Predominance: Plaintiff and Class Members were all injured by the same unlawful conduct, as the misleading advertisements were intentionally distributed to maximize visibility. Therefore, there are common questions of law and fact shared by the Class, and those questions and their common answers will predominate over any questions that might affect particular Class Members.

    c. Typicality: Plaintiff's claims are typical of those of the Class. Plaintiff's injury has been caused by the general unlawful conduct of Defendant, which would provide the same basis for a claim for all Class Members.

    d. Adequacy of Representation: Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are not antagonistic to the Class. Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class actions.

    e. Superiority: A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Class Members' claims are not efficient or economical for them to litigate on an individual basis. Even if the Class Members could afford it, the court system could not, as judicial resources would be tied up in the management and oversight of tens of thousands of actions, all based on the same alleged wrongdoing of Defendant. This is an appropriate forum in which to litigate these claims, as New York State's population and the Class Members are concentrated in this forum. Finally, there are no particular difficulties presented by the management or trial of this action as a class action.

**<u>First Cause of Action – Violation of Chapter 501, Florida Statutes</u>**

48. Plaintiff repeats and realleges the allegations in paragraphs 1 through 47 as if fully set forth herein.

49. Plaintiff brings this claim against Defendant under Florida Statutes, Chapter 501, on behalf of himself and the Class.

50. §501.204(1), Florida Statues, declares unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce."

51. Defendant's Bonus Bet promotion is misleading, deceptive, unlawful, fraudulent, and unfair, as Defendant misrepresented the nature of the Bonus Bet promotion.

52. Defendant disseminated throughout the state of Florida, through advertising, marketing, and other publications, statements that were untrue, deceptive, and misleading, which Defendant knew were untrue and misleading, for its own pecuniary gain.

53. Defendant's misrepresentations were material and substantially uniform in content, presentation, intent, and impact upon consumers/users at large. Consumers/users were exposed to Defendant's material misrepresentations.

54. Defendant made its deceptive and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

55. Plaintiff and the Class have suffered injuries as a result of Defendant's described conduct.

56. Defendant's conduct as alleged herein constitutes a deceptive act and practice in the conduct of business in violation of Chapter 501, Florida Statues, and Plaintiff and the Class have been damaged.

57. As a result of Defendant's recurring deceptive acts and practices, Plaintiff and other Class Members are entitled to monetary and compensatory damages, of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs in accordance with Chapter 501, Florida Statutes.

## **Prayer for Relief**

WHEREFORE, Plaintiff, individually, and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certifying the proposed Class, appointing Plaintiff as representative of the Class and appointing counsel for Plaintiff as Class Counsel;

B. Declaring that Defendant is financially responsible for notifying the Class members of the pendency of this suit;

C. Declaring that Defendant's policies and practices as described herein constitute a violation of the consumer protection statutes invoked herein;

D. Enjoining Defendant from the wrongful conduct as described herein;

E. Awarding actual and/or compensatory, multiple, punitive, and statutory damages in an amount according to proof;

F. Awarding Plaintiff and the Class as applicable, their reasonable costs and expenses of the suit, including attorney's fees;

G. Awarding pre- and post-judgment interest to the extent the law allows; and

H. Awarding such further relief as this Court may deem just and proper.

## Demand for a Jury Trial

Plaintiff and the Class, as applicable, hereby demand trial by jury on all issues in this Class Action Complaint that are so triable.

Dated: May 2, 2024

        By:   /s/  Joshua S. Smith
        ***JOSHUA SMITH, P.A.***
        Joshua S. Smith, Esquire
        FBN:   108915
        4043 Henderson Blvd.
        Tampa, FL 33629
        Telephone: 813-254-1800
        Attorney for Plaintiff, Montgomery